UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| TODD MERKEL AND MELISSA MERKEL, Individually and as Guardians, Parents, and Next Friends of M.M., <br><br> Plaintiffs, <br><br> v. <br><br> GALVA CUSD 224, GALVA CUSD 224 BOARD OF EDUCATION, JERRY BECKER, and KURTIS SMYTH, <br><br> Defendants. | Case No. 4:23-cv-04130-SLD-JEH |

## ORDER

Plaintiffs Todd Merkel ("Todd") and Melissa Merkel ("Melissa") (collectively "Plaintiffs"), on behalf of their child, M.M.,[1] assert that Defendants GALVA CUSD 224 ("the District"), GALVA CUSD 224 Board of Education ("the Board"), Jerry Becker, and Kurtis Smyth (collectively "Defendants") are liable for neglecting and discriminating against M.M. by failing to properly implement an educational plan and to accommodate her disability. *See generally* Compl., ECF No. 1. Pending before the Court is Defendants' Motion to Dismiss Counts III and V of Plaintiffs' Complaint at Law, ECF No. 11. For the reasons that follow, the motion is GRANTED.

---

[1] Where a filing contains "the name of an individual known to be a minor," such a filing may include only "the minor's initials." Fed. R. Civ. P. 5.2(a)(3). Although Plaintiffs violated this rule by including M.M.'s last name in their filings, the Court will still refer to this minor as M.M.

## BACKGROUND[2]

M.M. was a student at Galva Jr./Sr. High ("the School")—the Court infers that the School is part of the District, which is in turn controlled by the Board. The School, District, and Board are public government entities which receive federal funds, making them subject to federal law regarding the education of disabled students. Following a traumatic brain injury, M.M. was diagnosed with visual-vestibular integration dysfunction. Her symptoms included anxiety, headaches, poor cognitive stamina, eye fatigue, misreading, poor comprehension, skipping lines while reading, and feelings of imbalance and altered depth perception. Defendants declined to implement an individualized education program for M.M., but did implement a 504 Plan,[3] which specified certain accommodations as necessary to enable her to receive a public education. The 504 Plan is not yet before the Court, but the Complaint describes some of its required accommodations, such as tutoring during the school year, additional time to complete tests and assignments, reduced assignments printed in a packet with large font, excused absences for all appointments, excused incompletion of "unnecessary work," assistance of a human reader and additional time during standardized tests, designated rest time after 2nd hour, study hall during 8th hour, and remote completion of her World History assignments. *See* Compl. ¶¶ 19, 26, 28, 33, 36, 41, 44, 47–50, 57, 59–63, 66, 72, 74.

Defendants adherence to the 504 Plan often required repeated emails from Melissa or Todd and 504 Plan meetings between some combination of Melissa, Todd, M.M., Vicki Conner (a School counselor, often misspelled in the briefing as Connor), Smyth (the School's principal),

---

[2] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the nonmovant]'s favor." *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). Unless otherwise noted, the alleged factual background is drawn from Plaintiffs' Complaint.
[3] 504 Plan is a reference to "section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794." *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 525, 527 (7th Cir. 2014) (describing how a child's parents and school district "develop[ed] a plan (called a 504 plan) to accommodate [the child]'s disability and enable him to attend public school").

and M.M.'s teachers. Becker, the District's superintendent, frequently did not respond to emails from Plaintiffs and did not attend the 504 Plans to which he was invited. The only affirmative conduct or words attributed to Becker by the Complaint is his reply to an email from Melissa, informing her that they would not provide tutoring over the summer because tutoring was only provided when school was regularly in session.

Plaintiffs' Complaint describes many instances between mid-March 2020 and May 2023 where the 504 Plan was not properly implemented. As examples, some teachers failed to print out and give to M.M. her assignments in the required large-font format. She received failing grades for some assignments which "were added late to Google Classroom and were not printed out" for her. *Id.* ¶ 47. Assignment packets which were promised to be delivered later were never given to her. Her English teacher, Matt Bersell, was a permanent substitute—he took over the class in January 2022 and was her teacher for the remainder of the school year—that never received a copy of M.M.'s 504 plan and consistently failed to reduce and print out her assignments. Her World History teacher, Adam Norway, also failed to reduce the size of assignments, as required by the 504 Plan. On one occasion, M.M. had a bloody nose and was tardy to school. Students receiving an A in "AG class" were exempt from taking final exams, yet she was temporarily assigned a "Crops & Soils final" due to that late arrival to school. *Id.* ¶¶ 37–40. Only after Melissa sent Smyth an email asking about accommodations for that final and a meeting between Smyth and M.M. was M.M. excused from taking that final.

Plaintiffs' Complaint asserts that M.M.'s physical education ("P.E.") teachers were particularly hostile to the 504 Plan. On January 18, 2022, M.M.'s P.E. teacher, Tyler Nichols, yelled at her in a hallway for not submitting an assigned P.E. log. Conner had told M.M. that she did not need to submit the log because she was ill for part of December and had a doctor's note.

Smyth witnessed Nichols yelling at M.M. but did not intervene. Nichols never responded to an email from Melissa about this incident. At a 504 Plan meeting held on April 23, 2022, M.M. complained about the "extreme anxiety" she felt when Smyth and Nichols stood by her locker between classes, requesting that they stop doing so. *Id.* ¶ 52. Three days later, Nichols mocked her complaints at the April 23, 2022 meeting and warned other teachers not to look at her. The following year, on April 13, 2023, M.M. learned that a different P.E. teacher, Josh Harris, had given her a failing grade in P.E. despite a medical note excusing her from P.E. M.M. and Todd discussed the failing grade with Conner, who said that she would speak with Harris about it. On April 17, 2023, Melissa sent Conner an email because the grade had not yet been corrected. Two days later, M.M. was in an unspecified office and overheard Harris yelling at Conner, stating: "[M.M.] can have her A, I am sick of this. It is ridiculous." *Id.* ¶ 71. Anyone in that office, including M.M., could have heard Harris's comments about M.M.

      Proper accommodations for standardized tests proved to be elusive and a point of frequent concern for Plaintiffs. M.M. was forced to take the Star360 Reading and Math tests—which were schoolwide progress monitoring tests—without the additional time required by the 504 Plan. In response to an email from Melissa complaining that those tests did not accurately capture M.M.'s actual abilities, Smyth stated that she was not given additional time because the tests were not graded. Further, accommodations were inconsistent for M.M.'s taking of the Preliminary Scholastic Aptitude Test ("PSAT"). M.M. took the first half of the PSAT through her tutor—Anna Olson—after school, off school grounds, and without accommodations. She later completed the second half at the school with a teacher who was able to read the test to her. Melissa sent an email complaining to Conner about this, noting that having to read the first half of the PSAT caused M.M. nausea, difficulty sleeping, and a severe headache. Conner chalked up

the lack of accommodations to miscommunications with Anna about the College Board's requirements for the PSAT and whether M.M. would take the PSAT over a long weekend. Melissa pushed back on whether there was ever a plan to work over the long weekend and expressed her concern that Defendants simply failed to request PSAT accommodations from the College Board for M.M. She eventually took it upon herself to complete and submit the forms required by the College Board for M.M.'s PSAT, Scholastic Aptitude Test, and Advanced Placement tests. The accommodations ultimately granted by the College Board to M.M. were much more extensive than what Conner had said it would give her. *See id.* ¶¶ 61, 63, 74.

Plaintiffs describe how M.M.'s educational experience and life were negatively impacted by Defendants' failures to properly implement her 504 Plan. On one occasion, her AG teacher "turned up the music" on a computer game the students were playing, which gave M.M. "a horrible headache." *Id.* ¶ 36. She was totally unable to perform in her next class and was unable to recover during her designated rest period. Olson stated that M.M. was "stuttering like crazy, her eyes looked tired and droopy, and she cried while trying to complete the English assignment." *Id.* Additionally, despite M.M.'s qualifications, she was denied entry into the School's chapter of the National Honor Society. Plaintiffs assert this denial was retaliation for their advocacy and demands that Defendants adhere to the 504 Plan. Also, she requested "to take the Accuplacer test for Black Hawk College placement," but she was not notified like other students of when the testing would take place. *Id.* ¶ 53. Defendants' conduct contributed to M.M.'s extreme anxiety, depression, low self-esteem, humiliation, intense headaches, and academic regression. Her anxiety "was so bad as a result of the Defendant[]s['] conduct[] that she began self-harming." *Id.* ¶ 52.

5

Plaintiffs' Complaint was filed on August 10, 2023 and asserts seven counts: (I) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *id.* ¶¶ 82–92; (II) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, *id.* ¶¶ 93–98; (III) deprivation of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, asserted via 42 U.S.C. § 1983, *id.* ¶¶ 99–106; (IV) willful and wanton conduct, *id.* ¶¶ 107–16; (V) intentional infliction of emotional distress ("IIED"), *id.* ¶¶ 117–21; (VI) "indemnification," *i.e.*, that the District and/or Board be required to indemnify Smyth and/or Becker pursuant to 745 ILCS 10/9-102, *id.* ¶¶ 122–26; and (VII) "responde[a]t superior," *i.e.*, that the District is liable for individuals' actions via agency principles, *id.* ¶¶ 127–29. Defendants seek the dismissal of Count III (substantive due process) and Count V (IIED) pursuant to Federal Rule of Civil Procedure 12(b)(6). Mot. Dismiss 1–2; Mem. Supp. Mot. Dismiss 1, 5–11, ECF No. 11-1.

## DISCUSSION

### I. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the motion to dismiss stage, the key inquiry is whether the complaint is "sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[M]ere 'labels and conclusions or a formulaic recitation of the elements of a cause of action'" are not sufficient to satisfy the plausibility standard. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). A court must take "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, . . . [as] true," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013), and "draw all inferences in the light most favorable to the nonmoving party," *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014).

II. Analysis

A. Count III: 42 U.S.C. § 1983 and Substantive Due Process

Plaintiffs allege that Defendants' actions taken under the color of law "were arbitrary and capricious," "not rationally related to any legitimate interest," and violated M.M.'s "clearly established right to equal access to all benefits and privileges of a public education and [her] right to be free from . . . illegal practices and policies." Compl. ¶¶ 102, 104. Defendants advance two primary arguments against this claim: (1) Plaintiffs have failed to validly identify a fundamental right which was infringed; and (2) Defendants' conduct was not sufficiently arbitrary or irrational as to shock the conscience. Mem. Supp. Mot. Dismiss 5–8. Plaintiffs' response surveys generalized section 1983 and Fourteenth Amendment caselaw, quotes at length from the Complaint, and then asks that Defendants' motion be denied or, in the alternative, for leave to amend. Resp. Mot. Dismiss 3–6, ECF No. 13.

"A person seeking relief under section 1983 for a violation of her Fourteenth Amendment right to substantive due process faces a difficult task." *Flores v. City of South Bend*, 997 F.3d 725, 729 (7th Cir. 2021). "[T]he scope of substantive due process is very limited," and courts are "reluctant to expand the concept of substantive due process." *Campos v. Cook County*, 932

F.3d 972, 975 (7th Cir. 2019) (alteration in original) (quotation marks omitted); *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) (noting that the Due Process Clause of the Fourteenth Amendment "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997))). "[S]uch claims must meet a high standard," which "requires allegations of conduct under color of state law that violated a fundamental right or liberty and was so arbitrary and irrational as to shock the conscience." *Robbin v. City of Berwyn*, 108 F.4th 586, 589 (7th Cir. 2024) (quotation marks omitted).

Defendants describe Plaintiffs' reliance on a right to a public education as a "substantive due process nonstarter." Mem. Supp. Mot. Dismiss 7. The Supreme Court has already held that an education is not a right protected under the Fourteenth Amendment, either explicitly or implicitly. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973); *see also Smith ex rel. Smith v. Severn*, 129 F.3d 419, 429 (7th Cir. 1997) ("The question of whether a public education is a fundamental right is not a novel one."). Plaintiffs invoke a "clearly established right to equal access to all benefits and privileges of a public education and a right to be free from [Defendants'] illegal practices and policies." Compl. ¶ 102. To the extent that a "clearly established right" is a stand-in for a "fundamental" right, Plaintiffs cannot maintain a substantive due process claim based upon a fundamental right to an education. *See Rodriguez*, 411 U.S. at 35. Plaintiffs identify no other assertedly fundamental rights or liberties, such that the Court need not analyze whether Defendants' alleged deprivation of these unidentified interests was conscience shocking.

If a plaintiff is not relying upon a fundamental right or liberty but instead a property interest, the plaintiff "must allege that the defendants deprived him of a state-created property interest by arbitrary and irrational conduct and that the defendants either committed a separate constitutional violation or state law remedies are inadequate." *Campos*, 932 F.3d at 975; *see also Isabella A. ex rel. David A. v. Arrowhead Union High Sch. Dist.*, 323 F. Supp. 3d 1052, 1063 n.7 (E.D. Wis. 2018) (applying this test in the high-school context). A defendant's conduct is "neither arbitrary nor irrational" if it is "rationally related to a legitimate government interest," and a court need not even reach this rational-basis review for substantive due process violations based upon a property interest if a plaintiff fails to identify a separate constitutional violation or the inadequacy of state law remedies. *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). Public education made compulsory by state law may provide a constitutionally protected interest. *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Doe v. Purdue Univ.*, 928 F.3d 652, 660 (7th Cir. 2019). Yet even if the Court presumes that Plaintiffs could rely upon a property interest in a right to a public education, they do not identify a separate constitutional violation and invoke state law remedies like willful and wanton misconduct and IIED, suggesting that state law remedies are adequate to redress at least some of M.M.'s harms. *See* Compl. ¶¶ 107–21. At a minimum, Plaintiffs do not allege that state law remedies are inadequate to redress the harm to the property interest in a public education, thereby failing to plausibly allege a substantive due process claim based upon such an interest. Given this failure, the Court need not consider whether Defendants' conduct was arbitrary or irrational. *See Lee*, 330 F.3d at 467.[4]

---

[4] Plaintiffs also point to written policies and procedures—which the District allegedly enacted to comply with the Illinois Bullying Prevention Act, 105 ILCS 5/27-23.7—as establishing a minimum standard of conduct which required that "[a]ny district employee that suspects or receives knowledge that a student may be abused shall immediately report the abuse [to the Department of Children & Family Services] and notify the Superintendent or Principal that a report has been made." Compl. ¶¶ 105–06. Presumably the implication of including this policy in the Complaint's substantive due process claim is that district employees failed to report the abuse of M.M., thereby violating that written policy and perhaps state law. Yet even if a district employee's failure to report events like

9

Plaintiffs' substantive due process claim must be dismissed. Plaintiffs ask in the alternative for leave to amend this claim. Resp. Mot. Dismiss 6. "Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) (quotation marks omitted). Here, it is not certain that amendments to this claim would be futile or unwarranted—at the least, Plaintiffs should be given the chance to clarify their theory of liability and the rights which they invoke as the basis for this claim. Therefore, Plaintiffs are given leave to file an amended version of their substantive due process claim.

### B. Count V: IIED

Plaintiffs allege that Defendants engaged in extreme and outrageous conduct which was either intentionally or recklessly meant to subject M.M. to severe emotional distress, namely by engaging in: (1) teacher-on-student verbal abuse; (2) refusing to stop and actually encouraging teacher-on-student harassment; and (3) refusing to stop such harassment after receiving notice of these incidents and a request to intervene. Compl. ¶¶ 118–19. Defendants assert that the conduct alleged was not "extreme or outrageous" as a matter of law. Mem. Supp. Mot. Dismiss 8. Plaintiffs respond by quoting at length from Restatements and their Complaint, asserting that Defendants took advantage of their position of authority over M.M. and acted recklessly. Resp. Mot. Dismiss 6–9. They also request that the Court either deny the motion to dismiss or grant them leave to amend. *Id.* at 9. Like the parties, the Court applies Illinois law to this claim. *See*

---

Nichols mocking M.M. as abuse was a violation of state law, "[s]tate law violations do not form the basis for imposing § 1983 liability." *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003); *see also White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("It is therefore a truism, reiterated many times by this court, that mere allegations of state law infraction are insufficient to support a Section 1983 claim.").

*McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("When no party raises [a] choice of law issue, the federal court may simply apply the forum state's substantive law.").

According to the Seventh Circuit:

> [T]o state a cause of action for intentional infliction of emotional distress under Illinois law, a plaintiff must allege that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; [and] (3) the defendant's conduct in fact caused severe emotional distress."

*Cook v. Winfrey*, 141 F.3d 322, 330–31 (7th Cir. 1998) (second alteration in original) (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994)). "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003)). "Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable." *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976). Nor are "[m]ere insults, indignities, threats, annoyances, petty oppressions or trivialities . . . actionable as intentional infliction of emotional distress." *Cook*, 141 F.3d at 331 (quotation marks omitted). "[T]o avoid imposing liability for idiosyncratic and individualized reactions, [w]hether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of a particular case." *Richards*, 869 F.3d at 567 (second alteration in original) (quotation marks omitted).

Defendants focus only upon whether the Complaint's allegations satisfy the high bar of "extreme and outrageous," and do not argue that Plaintiffs did not suffer severe emotional distress nor address the intentionality or recklessness of their alleged conduct. Mem. Supp. Mot. Dismiss 8–11. The only responsive argument advanced by Plaintiffs is that M.M. was

11

vulnerable by virtue of her disability and that Defendants abused their authority over her. Resp. Mot. Dismiss 9. Regarding the "extreme and outrageous," element, courts may consider:

> [T]hree factors for assessing the outrageousness of a defendant's conduct: (1) the amount of power or control the defendant has over the plaintiff; (2) whether the defendant reasonably believed its objective was legitimate; and (3) whether the defendant knew the plaintiff was "particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."

*Zimny v. Geneva Cmty. Unit Sch. Dist. 304*, No. 22-cv-4512, 2024 WL 707195, at *21 (N.D. Ill. Feb. 21, 2024) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809–811 (Ill. 1988)). "[O]utrageousness is a fact-bound determination," and the above factors are not exhaustive. *Id.*

While the student-status, age, and disabilities of a plaintiff are relevant factors in this analysis, claims of IIED which have withstood a motion to dismiss have involved conduct which is much more reprehensible than what is alleged here. For example, a court relied in part upon the student's age—12 years old—and disabilities—including autism and unspecified anxiety disorder—in finding that the plaintiff plausibly alleged extreme and outrageous conduct. *Id.* at *22. But in that case, the principal attempted to manipulate the student into admitting that he had threatened to shoot another student and while interrogating the student, he kicked the student's chair, slammed his hands on the table, and screamed at the student. *Id.* at *21. And the assistant principal had also aggressively questioned the student after the student had been struck with a hockey stick by another student, refusing to allow the student to call his father or leave the nurse's office once the questioning had made him anxious. *Id.*; *see also Black ex rel. J. D. v. Littlejohn*, No. 19 C 2585, 2020 WL 469303, at *1, 8 (N.D. Ill. Jan. 28, 2020) (emphasizing the authority that teachers have over students in finding sufficient allegations of extreme and outrageous conduct where the disabled eleven-year-old student attempted suicide after "teachers

12

regularly called [him] 'stupid,' 'dumb,' or 'retarded'" and hit, grabbed, scratched, punched, choked, and shoved the student).

Conversely, allegations of merely unprofessional or mean-spirited conduct have not withstood motions to dismiss. For example, a disabled student at a post-secondary transition program with "deficiencies in the areas of social interaction, social understanding, and obsessive and compulsive thoughts and behaviors," was subjected to conduct from his teachers which routinely "embarrassed and upset him," such as publicly "reprimanding him for turning in late assignments, mocking how long he took in the bathroom, and failing to inform him of dress requirements for vocational activities." *Nardella v. Leyden High Sch. Dist. 212*, No. 15-cv-4885, 2016 WL 3418571, at *1 (N.D. Ill. June 22, 2016) (quotation marks omitted). One teacher "threw a towel in [the student]'s face and yelled at him after he spilled water while doing dishes" and on another occasion "imitated him in front of the class." *Id.* The court noted the undisputed nature of the student's susceptibility to distress and stated that the "disparate power dynamic" was "readily apparent." *Id.* at *3. Even though "district employees purportedly behaved unprofessionally and disrespectfully, turning a blind eye to [the student]'s personal and educational needs," the district court concluded that the allegations did not reach the level of extreme and outrageous conduct. *Id.*; *cf. Douglas v. Lofton*, No. 12 C 8592, 2013 WL 2156053, at *10 (N.D. Ill. May 17, 2013) (collecting examples of "claims for intentional infliction of emotional distress that were dismissed by the court at the pleadings stage for failure to allege sufficiently extreme and outrageous conduct" (quotation marks omitted)).

Here, most of the conduct described in the Complaint is at best negligent or callous and is much closer to *Nardella* than *Zimny* or *Littlejohn*. *See* Mem. Supp. Mot. Dismiss 10 (citing *Nardella*, 2016 WL 3418571, at *1, 3). As a whole, Plaintiffs' allegations are insufficient to

plausibly allege that Defendants' conduct was extreme and outrageous. *See Nardella*, 2016 WL 3418571, at *3. Stray instances of ill-conceived mockery and overheard remarks simply do not suffice. *See Cook*, 141 F.3d at 331. Neither the increased susceptibility to emotional harm caused by M.M.'s disability nor the power imbalance between her and Defendants' agents make it plausible that she was subjected to conduct "so extreme as to go beyond all possible bounds of decency." *See Richards*, 869 F.3d at 566 (quotation marks omitted).

Plaintiffs' IIED claim must be dismissed. They ask in the alternative for leave to amend the IIED claim. Resp. Mot. Dismiss 9. Again, it is not certain that amendments to this claim would be futile or unwarranted as they may be able to point to other specific conduct that reaches the level of extreme and outrageous conduct. Therefore, Plaintiffs are given leave to file an amended version of the IIED claim. *See Runnion*, 786 F.3d at 519–20.

## CONCLUSION

Accordingly, Defendants' Motion to Dismiss Counts III and V of Plaintiffs' Complaint at Law, ECF No. 11, is GRANTED. Count III and Count V of Plaintiffs' Complaint, ECF No. 1, are DISMISSED WITHOUT PREJUDICE. Plaintiffs are given leave to file an amended complaint by October 18, 2024.


Entered this 27th day of September, 2024.

                                                      s/ Sara Darrow
                                                      SARA DARROW
                                                      CHIEF UNITED STATES DISTRICT JUDGE